UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROBERT MOCO,

          Plaintiff,

    -v-                                  Case # 17-CV-398-FPG

                                        DECISION AND ORDER

J.M. JANIK, et al.,

          Defendants.

_____

## INTRODUCTION

Pursuant to 42 U.S.C. § 1983, Plaintiff Robert Moco brings this prisoner civil rights action against Defendants J.M. Janik and Philip Voltz. His claims arise from two incidents at Gowanda Correctional Facility in which Defendants allegedly used excessive force against him and then failed to provide him with adequate medical care, in violation of his Eighth Amendment rights. *See generally* ECF Nos. 7, 34. Janik raises a counterclaim against Moco for state-law battery. ECF No. 56 at 4. Presently before the Court are Defendants' motion for summary judgment on Moco's claims (ECF No. 70) and Moco's motion for summary judgment on Janik's counterclaim (ECF No. 75). For the reasons that follow, Defendants' motion for summary judgment is GRANTED, and Moco's motion is DENIED.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding

1

whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted). Generally, when cross-motions for summary judgment are filed, the court "must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Physicians Comm. for Responsible Medicine v. Leavitt*, 331 F. Supp. 2d 204, 206 (S.D.N.Y. 2004).

## BACKGROUND

Moco entered the New York prison system in November 2015. ECF No. 75-10 ¶ 12. He was housed at Gowanda beginning on January 25, 2016. *Id.* ¶ 13. Janik and Voltz were correctional officers who worked at the facility. Moco's claims arise out of two incidents, which need only be described briefly for context.

The first incident occurred on January 27, 2016. That evening, Voltz was working in Moco's housing unit. The parties offer highly divergent accounts of what occurred. Moco claims that he approached Voltz and requested to see a doctor or nurse because of jaw pain. ECF No. 75-2 at 5. Voltz refused, became confrontational, insulted Moco, and then, for no legitimate reason, attacked him.[1] *Id.* at 7-9. Other officers intervened to stop Voltz's attack. *Id.* at 13. Moco was taken to the nurse's station, where he did not receive any treatment for his injuries, and then to the

---

[1] In his complaint and at his deposition, Moco claimed that both Voltz and Janik were involved in the January 27, 2016 attack. *See* ECF No. 7. In his responsive Statement of Facts, however, Moco concedes that Janik was not working at Gowanda on January 27, ECF No. 75-10 ¶ 16, and, consequently, could not have been involved.

special housing unit ("SHU"), where he was beaten.  *Id.* at 19, 21.  Voltz denies Moco's account and states that he escorted Moco to the nurse's station because Moco "was acting erratically and attempting to smash his own head into the wall."  ECF No. 70-10 ¶ 8.  Moco was thereafter placed on a "mental health/suicide watch" and was transferred to Attica Correctional Facility for a mental health referral.  ECF No. 75-10 ¶¶ 20, 22.

The second incident occurred on January 30, 2016, after Moco returned to Gowanda.  *Id.* ¶ 24.  Again, the parties' accounts differ dramatically.  Janik testified that, as he was sitting in his office, he heard Moco "screaming and yelling profanities" in the hallway.  ECF No. 70-5 at 5.  Janik approached Moco to inquire "what the issue was," but Moco "just continued to scream."  *Id.* at 7.  Janik directed Moco to follow him, and they walked to the rotunda.  Janik asked Moco to place his hands on the wall.  *Id.*  Moco told Janik to "fuck off" but eventually complied.  *Id.* at 8.  As Janik was performing a pat frisk, Moco "came off the wall and struck [Janik] in [the] right eye with his right elbow."  *Id.* at 10.  Janik grabbed Moco and thrust him to floor, while Voltz arrived to assist.  *Id.* at 11-12.  After some resistance, Janik and Voltz were able to handcuff Moco, and Moco was taken to the medical unit.  *Id.* at 15-16.  In contrast, Moco asserts that, as he was attempting to make a phone call, Janik and Voltz attacked him for no legitimate reason, throwing him to the floor, punching him, and, at one point, "trying to break [his] thumbs."  ECF No. 70-4 at 29-30, 32, 34-35.  As with the prior incident, Moco alleges that he did not receive medical attention after the attack.  ECF No. 75-2 at 37.

Moco did not immediately file a grievance concerning either incident.  Instead, on February 12, 2016—13 days after the later assault—Moco sent a letter to the Commissioner of New York's Department of Corrections and Community Supervision ("DOCCS"), requesting a transfer from Gowanda due to the assaults.  *See* ECF No. 82 at 32-33.  On March 16, 2016—46 days after the

last incident—Moco sent a letter to Gowanda's superintendent, requesting medical treatment for injuries that had allegedly resulted from the assaults. *See* ECF No. 70-7 at 11-12. At some point, Moco was transferred to Auburn Correctional Facility. Moco claims that, on August 31, 2016, he filed a formal grievance about the incidents. *See* ECF No. 75-5 ¶ 9. During discovery, he produced a copy of the grievance he claimed to have filed at Auburn. *See* ECF No. 75-8 at 2. Cheryl Parmiter, the supervisor of the inmate grievance program at Auburn, avers that there is no record of Moco ever having filed that grievance, and she notes that the document Moco proffered "has no grievance number," which suggests that the grievance "was never filed." ECF No. 70-17 ¶ 12. There is also no record that Moco appealed his grievance to the Central Office Review Committee ("CORC"). *See* ECF No. 70-12 ¶ 12; ECF No. 70-13.

On May 10, 2017, Moco, acting *pro se*, filed the present action. ECF No. 1. After Defendants' motion to dismiss, the Court permitted four Eighth Amendment claims to proceed to discovery: "two [claims] for excessive force [against Defendants] during the alleged assaults [in January 2016] and two [claims] for denial of medical care after both incidents." ECF No. 34 at 6. In January 2020, Moco was appointed counsel. ECF No. 53.

## DISCUSSION

The Court begins by addressing Defendants' motion. Defendants primarily argue that summary judgment is appropriate on Moco's claims because he failed to exhaust his administrative remedies. Because the Court agrees, it need not address Defendants' alternative arguments.

Under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The administrative exhaustion requirement "applies to

all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  If an inmate fails to exhaust his administrative remedies, he is barred from commencing a federal lawsuit. *Martin v. Niagara Cty. Jail*, No. 05-CV-00868, 2012 WL 3230435, at *6 (W.D.N.Y. Aug. 6, 2012).  In other words, to commence a lawsuit "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012).  Exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011).  To be "[p]roper," exhaustion must comply with all of the agency's "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

To satisfy the PLRA's exhaustion requirement, an inmate in New York is generally required to follow the prescribed grievance procedure, which is set forth at 7 N.Y.C.R.R. § 701.5. The inmate's administrative remedies consist of a three-step grievance and appeal procedure: (1) investigation and review of the grievance by the Inmate Grievance Resolution Committee ("IGRC"); (2) if appealed, review of the IGRC's determination by the superintendent of the facility; and (3) if the superintendent's decision is appealed, review and final administrative determination by CORC. *See id.*  All three steps of this procedure must ordinarily be exhausted before an inmate may commence suit in federal court. *See Morrison v. Parmele*, 892 F. Supp. 2d 485, 488 (W.D.N.Y. 2012).

In this case, it cannot be reasonably disputed that Moco failed to exhaust his administrative remedies.  Indeed, in his opposition memorandum, Moco does not develop any argument to the contrary.  *See* ECF No. 75-9 at 9-11; *see also Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir.

2014) (noting that, in the case of a counseled non-moving party, "a partial opposition may imply an abandonment of some claims or defenses").   Under New York's grievance procedures, Moco was required to file an inmate grievance "within 21 calendar days of an alleged occurrence on an inmate grievance complaint form."   7 N.Y.C.R.R. § 701.5(a)(1).   At best, Moco did not submit a grievance on the appropriate form until August 2016, more than six months after the occurrences.[2] *See* ECF No. 75-5 ¶ 9; ECF No. 75-10 ¶ 82.

In addition, Moco never appealed or attempted to appeal any such grievance through CORC—a necessary step to exhaust.   *See* 7 N.Y.C.R.R. § 701.5(d); *Omaro v. Annucci*, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014) ("It is well-established that an inmate who does not appeal to CORC has failed to exhaust his administrative remedies.").   In their Rule 56 Statement of Facts, Defendants assert that CORC "has no record of [Moco] filing any grievance appeals" over the January assaults.   ECF No. 75-10 ¶ 65.   Although Moco purports to "dispute" this assertion in his responsive Statement of Facts, he does not actually cite any supportive evidence.   *See id.*

Accordingly, there is no genuine issue of material fact that Moco failed to fully exhaust his administrative remedies.

Nevertheless, Moco argues that his failure to exhaust his administrative remedies is excusable because those remedies were rendered "unavailable" by his difficulties with the English language.   Specifically, Moco was born in Albania, and he asserts that, at the time of the incidents,

---

[2] Neither Moco's earlier letter to the commissioner nor his request to the superintendent may be treated as a "grievance."   *See* 7 N.Y.C.R.R. § 701.2(a) ("A letter addressed to facility or central office staff is not a grievance."); *see, e.g.*, *Timmons v. Schriro*, No. 14-CV-6606, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."); *Muhammad v. Pico*, No. 02-CV-1052, 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements.").

his "understanding of the English language" and his "ability to read English" were "extremely limited." ECF No. 75-5 ¶ 3. No personnel at Gowanda explained the grievance procedures to him, and the written materials he received "provided certain guidance, but because of [his] limited grasp of the English language, [he] was generally unaware of the specific procedures." *Id.* ¶ 4.

"[P]risoners are exempt from the exhaustion requirement when administrative remedies are 'unavailable.'" *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 311 (2d Cir. 2020). "An administrative procedure may be unavailable when (1) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is so opaque that it becomes, practically speaking, incapable of use; or (3) when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* (internal quotation marks omitted). The inquiry is objective: whether "a similarly situated individual of ordinary firmness have deemed [the ordinary grievance procedures] available." *Id.* at 311-12.

Some courts have held that grievance procedures are "unavailable" when the facility fails to communicate those procedures to non-English speakers "in a way reasonably likely to be understood." *Ramirez v. Young*, 906 F.3d 530, 535 (7th Cir. 2018). In *Ramirez*, the Seventh Circuit excused a Spanish-speaking inmate's failure to exhaust because prison officials communicated the procedures only in English, "a language they knew he could not understand." *Id.* at 533. This holding follows from the notion that "remedies are not available where prisoners are not informed of their existence." *Smith v. City of New York*, No. 12-CV-3303, 2013 WL 5434144, at *8 (S.D.N.Y. Sept. 26, 2013).

Moco's failure to exhaust cannot be excused on this basis, however. The holding in *Ramirez* was premised on prison officials' awareness of, and refusal to provide assistance for, the

inmate's language difficulties.  *See Ramirez*, 906 F.3d at 536, 538 (emphasizing that the language barrier "was not a secret to the prison" and criticizing the prison's "failure to communicate the grievance process to [the inmate] despite widely shared knowledge of his lack of English proficiency").  By contrast, Moco does not marshal any evidence that Gowanda officials were or should have been aware of his difficulties with the English language, such that they should have translated the grievance procedures into Albanian even without a request.  Moco had been in the United States for approximately 14 years when he entered DOCCS custody.  ECF No. 76-2 at 3.  His intake record states that spoke and understood English.  *See* ECF No. 76-1 ¶¶ 8, 9.  While at Gowanda, Moco communicated in English with prison personnel, including Defendants.  *See* ECF No. 75-2 at 5; *see also* ECF No. 76-3 ¶¶ 5, 7.  Within two months after the January 2016 incidents, Moco was able to write two coherent letters in English to DOCCS staff about the incidents.  *See* ECF No. 75-6 at 2-3; ECF No. 82 at 32-33.  These facts establish that, at least from the point of view of prison officials, Moco was proficient in the English language, and Moco cites no evidence to support his contrary assertion that "[h]is need for assistance was or should have been apparent" to them.  ECF No. 75-9 at 10.  Thus, the Court is not faced with a situation like *Ramirez*, where prison officials communicated the grievance procedures "in a language *they knew* [the inmate] could not understand."  *Ramirez*, 906 F.3d at 533 (emphasis added).

By all appearances, Moco could speak and understand English in a manner sufficient to understand the written grievance-procedure materials, to make requests, and to protect his rights.  Moco marshals no legal authority for the proposition that grievance procedures are deemed unavailable merely because prison officials fail to divine that, despite appearances, an inmate has a language deficit that renders him subjectively unaware of the required grievance procedures.  *See* ECF No. 75-9 at 9-10; *see also Galberth v. Washington*, No. 14-CV-691, 2017 WL 3278921, at

*10 (S.D.N.Y. July 31, 2017) (collecting cases and explaining that "[w]here courts have been presented with inward-looking justifications for a failure to exhaust, which are based in a prisoner's subjective sense of what was available, such justifications have been rejected").  Moco's claim is all the more untenable because he offers no reason why he failed to make use of the available resources and language assistance offered to inmates in DOCCS custody.  *See* 7 N.Y.C.R.R. § 701.3(h) ("Translators will be used to facilitate access to the IGP for those inmates who do not speak English."); DOCCS Directive No. 4490 (Jan. 6, 2020) (discussing policies to provide access to "DOCCS programs, services, and benefits" for inmates with "Limited English Proficiency").[3]  Around the time of these events, Moco showed himself perfectly capable of communicating other requests in English to prison officials, and he admits that he was aware that the DOCCS had certain grievance procedures, but he chose not to request language assistance until more than six months after he learned of those procedures.  *See* ECF No. 75-5 ¶ 4; ECF No. 70-7 at 14.  By that point, his time to pursue a grievance related to the incidents had expired.

  At bottom, the fact that Moco chose not to make use of the available assistance and resources, and therefore remained *subjectively* ignorant of the required procedures, is insufficient to establish that the grievances procedures were *objectively* unavailable.  *See Briscoe v. D'Agata*, No. 14-CV-7384, 2016 WL 3582121, at *7 (S.D.N.Y. June 28, 2016) ("The availability of administrative remedies is adjudged not by whether the Plaintiff was unaware of them, but instead by whether a similarly situated individual of ordinary firmness would have deemed them available." (internal quotation marks omitted)).  Moco's failure to exhaust may not be excused under these circumstances.  *See, e.g.*, *Ramos v. Smith*, 187 F. App'x 152, 154 (3d Cir. 2006) (summary order) (inmate's claimed illiteracy did not excuse exhaustion requirement, since "the

---

[3] Directive No. 4490 is available at https://doccs.ny.gov/Directives/4490.pdf (last visited on Nov. 9, 2021).

warden [was] required to give an illiterate inmate the assistance required to prepare and file an appeal," and inmate did not claim "that he asked for and was refused assistance in filing his administrative appeals"); *De La Cruz v. Graber*, No. 16-CV-1294, 2017 WL 4277129, at \*7 n.17 (C.D. Cal. June 15, 2017) (administrative remedies were available to Spanish-speaking inmate where, *inter alia*, warden was required to provide language assistance to inmates and inmate " has not suggested he ever sought and was denied such assistance"); *Bowens v. Fed. Bureau of Prisons*, No. 12-CV-5591, 2013 WL 3038439, at \*4 (S.D.N.Y. June 18, 2013) ("[U]nless a prisoner's request for such assistance is denied, a language-based impairment does not amount to a special circumstance justifying departure from the exhaustion requirement." (internal quotation marks and ellipsis omitted); *Tinsley v. FCI Bennettsville*, No. 12-CV-264, 2013 WL 568070, at \*8 (D.S.C. Jan. 24, 2013) ("[A]n illiterate inmate must have asked for and been refused assistance in pursuing his administrative remedies before his illiteracy may excuse his failure to exhaust.").

Therefore, the undisputed evidence establishes that Moco did not properly exhaust his available administrative remedies with respect to these incidents. Defendants' motion is granted, and Moco's Eighth Amendment claims are dismissed. *See* 42 U.S.C. 1997e(a). That dismissal is with prejudice, as Moco "had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust." *Demuth v. Hand*, No. 18-CV-769, 2019 WL 7756095, at \*3 (N.D.N.Y. Dec. 30, 2019).

Moco's cross-motion does not require extended analysis. Janik brings a state-law counterclaim for battery, alleging that during the January 30, 2016 incident, Moco struck Janik "in the eye with his elbow." ECF No. 56 at 4. Citing Janik's deposition testimony that he did not know whether Moco's action occurred "by way of a reflex," ECF No. 75-3 at 5, Moco contends that he lacked "the requisite intent to sustain" a claim for battery. ECF No. 75-9 at 14; *see also*

*Doe v. Alsaud*, 224 F. Supp. 3d 286, 294 (S.D.N.Y. 2016) (noting that battery requires a harmful or offensive bodily contact "made with intent"). The Court concludes that summary judgment is inappropriate, as a reasonable jury could find that Moco acted Janik intentionally. Janik testified that, as he was performing a pat frisk on Moco, Moco "came off the wall," ECF No. 70-5 at 10, and "spun" his body around as he struck Janik in the eye with his elbow. ECF No. 75-3 at 4-5. The record evidence, including this testimony, does not compel the conclusion that Moco's action was involuntary. Moco's motion for summary judgment is therefore denied.[4]

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 70) is GRANTED, and Moco's cross-motion for summary judgment (ECF No. 75) is DENIED. All claims against Defendants are dismissed with prejudice. The only remaining claim is Janik's counterclaim for battery against Moco. By separate order, the Court will schedule a status conference to hear from the parties on the progress of this action.

IT IS SO ORDERED.

Dated: November 15, 2021
      Rochester, New York

                                       HON. FRANK P. GERACI, JR.
                                        United States District Judge
                                        Western District of New York

---

[4] Moco also points out that, at the deposition, Janik was seemingly unaware that he had raised a counterclaim against Moco. *See* ECF No. 75-3 at 4. Moco posits that this means the counterclaim has been "voluntarily withdrawn," ECF No. 75-9 at 14, but he presents no legal authority to support that argument. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Regardless, Janik has since clarified that he was simply confused by the question and does, in fact, wish to pursue a counterclaim. ECF No. 77-1 at 2.